UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re                                          :      Chapter 11
                                               :
LEHR CONSTRUCTION CORP.,                       :      Case No. 11-10723 (SHL)
                                               :
                        Debtor.                :
------------------------------------------------------------X
JONATHAN L. FLAXER, not individually but       :
solely in his capacity as Chapter 11 trustee for :
Lehr Construction Corp.,                        :
                                               :
                        Plaintiff,             :
            vs.                                :      Adv. No. 13-01261 (SHL)
                                               :
PETER GIFFORD, PAUL McQUILLAN,                 :
LISA FAHEY, KEVIN McNICHOLAS,                  :
AND SANDOR FRANKEL P.C. f/k/a/                 :
FRANKEL & ABRAMS,                              :
                        Defendants.            :
------------------------------------------------------------X

## MEMORANDUM OF DECISION

A P P E A R A N C E S:

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
*Counsel for Jonathan L. Flaxer, Chapter 11 Trustee for Lehr Construction Corp.*
437 Madison Avenue
New York, NY 10022
  By:  Douglas L. Furth, Esq.
       Dallas L. Albaugh, Esq.
       Michael S. Weinstein, Esq.
       Michael S. Devorkin, Esq.
       Jonathan L. Flaxer, Esq.
       Daniel N. Zinman, Esq.

ARONAUER, RE & YUDELL, LLP
*Counsel for Peter Gifford*
60 East 42nd Street, Suite 1420
New York, NY 10165
  By:  Joseph Aronauer, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Defendant Peter Gifford's motion seeking to dismiss the Plaintiff

Trustee's complaint against him, which consists of a single claim under New York's faithless

servant doctrine (the "Complaint").  Suing in the shoes of the Debtor Lehr Construction

Corporation, the Trustee alleges that Gifford, a Lehr employee, participated in a scheme to

overbill Lehr's customers and must return compensation paid to him by Lehr.  Gifford argues

that Lehr instructed him to carry out the acts in question, and that the Trustee's claims are barred

by the *in pari delicto* doctrine because Lehr was at least equally culpable for the overbilling

scheme.  For the reasons set forth below, the Court concludes that the *in pari delicto* doctrine

bars the Trustee's claim.

## BACKGROUND

### I.    Lehr Construction Corporation and its Business Activities

As is required in a motion to dismiss, the Court assumes all the facts alleged in the

Complaint to be true.  Lehr planned, designed, and oversaw interior construction projects in and

around New York City.  Compl. ¶¶ 14, 28.  Generally, Lehr's work consisted of expanding or

renovating a customer's existing space.  Compl. ¶ 14.  Lehr competed for construction jobs by

submitting bids on construction project contracts to potential customers.  Compl. ¶ 15.  If

selected, Lehr became responsible for the completion of the construction project, even though

subcontractors would be used by Lehr for parts of the project.  Compl. ¶ 16.  Thus, Lehr worked

closely with specialized subcontractors, who often executed most of the construction work.

Compl. ¶ 16.

Gifford worked in the purchasing department at Lehr, which negotiated with construction

subcontractors.  Compl. ¶ 38.  The purchasing department "was responsible for 'buying out' a

project, *i.e.*, entering into the purchase orders with subcontractors to work on the project."
Compl. ¶ 20.  Mark Martino headed the purchasing department; Gifford and two others were
purchasing agents in that department.  Compl. ¶ 38.

Lehr generally grouped its services into two categories: fixed price and cost-plus projects.
Compl. ¶ 17.  Under these two different types of construction projects, Lehr owed different
duties to its customers and had different likelihoods to recover certain expenses from them.
Compl. ¶¶ 18, 26, 28, 30, 33, 34.  Under a fixed price project, the customer provided Lehr—and
its competitors—with finalized drawings depicting the customer's desired construction outcome.
Compl. ¶ 18.  To estimate the cost of meeting the customer's expectations (i.e., constructing
what was depicted in the finalized drawing), Lehr's estimating department inspected the space
that the customer sought to renovate or build out and evaluated subcontractor bids for the
necessary construction work.  Compl. ¶¶ 18-19.  Lehr also added oversight costs and a profit
factor before submitting a fixed price project bid to the potential customer.  Compl. ¶ 19.  If the
customer selected Lehr to complete the fixed price project, Lehr's bid became the "fixed" price
that the customer paid for the project, and the purchasing department entered into purchase
orders with subcontractors to execute the construction work.  Compl. ¶ 20.

Some fixed price projects required additional work that had not been priced into the fixed
price documented in the initial purchase order.  Compl. ¶ 24.  This additional work was generally
required for one of two reasons.  Compl. ¶¶ 24-26.  First, customers requested to change their
designs even after finalized drawings were submitted and the initial purchase order was agreed
upon.  Compl. ¶ 25.  If the customer wanted to modify a design after the initial purchase order
was agreed upon for a fixed price project, the customer had to change its order and pay Lehr for
the new work.  Compl. ¶¶ 24-25.  Second, Lehr could have overlooked or failed to price in

certain sub-jobs required to complete the project.  Compl. ¶ 26.  If Lehr reasonably overlooked

the additional work, the customer could still be asked to pay for it.  Compl. ¶ 26.  However, if

Lehr failed to account for work reasonably anticipated from the construction drawings, then Lehr

had to provide a "contract extra," and pay the subcontractors to complete the project out of

Lehr's potential profits.  Compl. ¶¶ 24-26.  Lehr's cost control department, headed by Dwayne

Mitchell, determined when the customer had to change its order and when Lehr had to provide a

contract extra.  Compl. ¶ 24.

In fixed price projects, Lehr continued to negotiate with subcontractors after a customer

had accepted Lehr's fixed price project bid.  Compl. ¶ 21.  If Lehr could convince the

subcontractors to accept less than had been budgeted for their work under the fixed price project,

Lehr could keep the difference without any obligation to pass the difference along to the

customer because Lehr was not working as the customer's agent.  Compl. ¶¶ 21, 25.  Thus, Lehr

made efforts to convince subcontractors to reduce their prices after the customer accepted the

fixed price project bid.  Compl. ¶¶ 22, 30.  For example, Lehr bundled multiple fixed price

projects to obtain post-acceptance discounts from subcontractors, who in turn benefitted from

securing jobs on multiple projects.  Compl. ¶ 22.

The second type of project was a cost-plus project in which Lehr acted as the agent for

the customer.  Compl. ¶ 28.  If Lehr negotiated with subcontractors to reduce their prices after

the customer accepted bids from Lehr and the subcontractors for cost-plus projects, Lehr was

obligated as the customer's agent to pass the excess along to the customer.  Compl. ¶ 30.  Thus,

Lehr had no incentive to convince the subcontractors to reduce their prices post-acceptance in

cost-plus projects.  Compl. ¶ 30.

There were other differences between the fixed price and cost-plus projects.  Compl. ¶¶ 28, 32.  Unlike in fixed cost projects, "where Lehr was generally provided with the construction drawings that it was tasked to build, in cost[-]plus projects Lehr generally worked with the customer and its agents in the planning and design of the construction project."  Compl. ¶ 28. Lehr then solicited bids from construction subcontractors and, as with fixed price projects, the estimating department considered the bids.  Compl. ¶ 29.  In cost-plus projects, customers expected that the initial purchase orders between Lehr and the subcontractors included all construction costs because of Lehr's involvement in creating the finalized drawings; sometimes additional work was nevertheless required to complete a cost-plus project.  Compl. ¶ 32. Because project completion was Lehr's responsibility, it paid subcontractors to perform the additional work.  Compl. ¶ 32.  Lehr's profits decreased if customers refused to reimburse Lehr for that work.  Compl. ¶ 32.  As a result, Lehr created a bid package (the "Bid Package"), which required subcontractors to submit bids for work required by the construction drawings, but also for additional work that Lehr believed could be required based on Lehr's prior experience. Compl. ¶ 33.  The Bid Package left Lehr a financial cushion to pay for additional work, sidestepping its past problems with customer reimbursement.  Compl. ¶ 34.

However, the Bid Packages' expansive descriptions of the subcontractors' work meant that the subcontractors would not always perform all of the work priced into the Bid Package. Compl. ¶ 34.  Thus, while the customer paid for all of the construction work priced into the Bid Package, not all of the work priced into the Bid Package would be provided.  Compl. ¶ 34. Acting as the customer's agent under a cost-plus project, Lehr was obligated to return the excess paid for work that was not provided.  Compl. ¶ 34.

## II.    The Criminal Scheme and its Participants

At some point between January 2000 and August 2004, Lehr began to purposely invoice customers with over-expansive descriptions of work, which included unperformed work in cost-plus project Bid Packages.  Compl. ¶¶ 33, 35.  The money allocated for that unperformed work was never returned to the customers.  Compl. ¶ 35.  Instead, Jeffrey Lazar, a senior officer at Lehr, oversaw a criminal scheme in which Lehr and its subcontractors conspired to keep the customers' funds paid for work that was never provided.  Compl. ¶ 35.  After the customers overpaid Lehr, Lehr overpaid the subcontractors.  Compl. ¶ 39.  To recoup some of the customers' overpayments that had been passed to the subcontractors, Lehr subsequently would hire the same subcontractor for a fixed price project where the subcontractor agreed to accept less money from Lehr than it had bid in the customers' accepted bid.  Compl. ¶ 41.  Mark Martino, the head of purchasing department, kept track of how the wrongfully kept excess payments were divided between Lehr and its subcontractors.  Compl. ¶ 42.

Gifford knowingly participated in Lehr's criminal scheme by negotiating with subcontractors to agree upon the actual cost of a Bid Package project as compared to the inflated Bid Package amount.  Compl. ¶¶ 38, 46.  He also "put [his] initials next to each credit and debit [in a record keeper] that indicated which member of the purchasing department . . . negotiated that particular line item [with the subcontractors]."  Compl. ¶ 42.  Gifford's direct superior was Mark Martino.  Compl. ¶ 38.  Martino discussed the excess funds with cost control department head, Dwayne Mitchell.  Compl. ¶¶ 24, 44.

Other individuals participated in Lehr's criminal scheme.  One such individual, senior officer Jeffrey Lazar, "oversaw [the] scheme that utilized the Bid Package to steal money from Lehr's customers."  Compl. ¶ 35.  He also "inflated the amount of the Bid Packages by including

more services than the subcontractor would actually need to render." Compl. ¶ 36. Jeffrey Lazar

had Martino provide him with monthly summaries that showed how much excess money each

subcontractor had kept and how much the subcontractors had funneled back to Lehr. Compl.

¶ 45. The head of the estimating department, Steven Wasserman, also participated in the

scheme. Compl. ¶ 36. Wasserman was responsible for "ensuring that the Bid Package issued to

the subcontractors contained services, and costs for such services, which *exceeded* what was

reasonably necessary under the circumstances." Compl. ¶ 36 (emphasis added).

## III.    The Criminal Investigation and Bankruptcy of Lehr

Lehr's criminal activity was suspected by the authorities in 2010. Compl. ¶ 48. In early

2010, the Manhattan District Attorney's Office investigated the construction industry generally.

Compl. ¶ 48. As a result of that investigation, on March 10, 2010, the Manhattan District

Attorney's Office and the New York State Police searched Lehr's offices and seized a substantial

amount of data. Compl. ¶ 50. The March 10th raid of Lehr's offices was widely publicized,

causing customers to discontinue hiring and working with Lehr. Compl. ¶¶ 51-53.

This loss of business contributed to Lehr's filing for protection under Chapter 11 of the

Bankruptcy Code in February 2011. Compl. ¶¶ 54-55. In May 2011, the Court ordered the

appointment of a Chapter 11 Trustee. *See* Order Directing the Appointment of Chapter 11

Trustee [Case No. 11-10723, ECF No. 191]. That same month, Lehr was indicted along with

several now-former employees. Compl. ¶ 56. Lehr was subsequently convicted of enterprise

corruption, a scheme to defraud, grand larceny in the second degree, and money laundering in

the first degree. Certificate of Disposition of Criminal Case against Lehr [ECF No. 15-6]. The

criminal scheme that was the subject of the criminal trial and the criminal scheme that is the

subject of the allegations in the Complaint are the same. Hr'g Tr. 30:1-12, Sept. 11, 2013 [ECF

7

No. 33].  Jeffrey Lazar was indicted and convicted of a scheme to defraud in the first degree and

sentenced to serve a prison term.  Certificate of Disposition of Criminal Case against Jeffrey

Lazar [ECF No. 15-7].  Wasserman was indicted and convicted of grand larceny in the fourth

degree, and sentenced to probation.  Certificate of Disposition of Criminal Case against

Wasserman [ECF No. 15-8].  Gifford was not indicted or convicted of any criminal activity

relating to Lehr's criminal scheme, but did enter into a cooperation agreement with the

Manhattan District Attorney's Office.  Compl. ¶ 61.

## IV.    The Adversary Proceeding Against the Defendant

In February 2013, the Trustee filed the Complaint against multiple defendants, including

Gifford.  The Complaint states that Gifford, as "a highly compensated employee, agent and

servant of Lehr[] . . . owed Lehr a duty of loyalty and fidelity . . . [and by] knowingly,

intentionally, and purposefully participating in [the criminal scheme], Gifford acted in a manner

adverse to and wholly inconsistent with his duties to Lehr."  Compl. ¶¶ 63-65.  The Trustee

requests that the Defendant "disgorge . . . all sums paid to or on behalf of Gifford as

compensation from [August 1, 2004,] to the present, as well as all legal fees for Gifford's legal

defense" because Gifford was a "faithless servant."  Compl. ¶ 68.  The amount sought is

$1,233,496.69.  Compl. ¶ 110(A).

Gifford has moved to dismiss the Complaint.  The Defendant argues that Lehr directed

and tolerated his allegedly disloyal conduct.  As such, Defendant contends that the Trustee

cannot now argue that the Defendant was disloyal to his employer.  Gifford's Mem. of Law, at 6-

8 [ECF No. 15-10].  Relatedly, the Defendant argues that the Trustee's claims are barred by *in

pari delicto* based on Lehr's own wrongdoing.  *Id*. at 8.  The Trustee contends that dismissal is

not appropriate because Lehr was not equally or more at fault for the scheme than the Defendant;

the Defendant acted adversely to Lehr; and the Defendant is an "insider." Trustee's Mem. of

Law, at 19-26 [ECF No. 26]. The Court heard argument on the Motion and received subsequent

briefing from both sides after argument [ECF Nos. 33, 79, 80, 82, 86, 88].

## DISCUSSION

### I.    Standard for Motion to Dismiss and Judicial Notice

A motion for judgment on the pleadings under Rule 12(c) is measured by the same

standard as a motion to dismiss under Rule 12(b)(6).[1] *Geron v. Seyfarth Shaw LLP* (*In re Thelen*

*LLP*), 736 F.3d 213, 218 (2d Cir. 2013) (citing *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir.

2009)). "To survive a Rule 12(c) motion . . . [a] 'complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* at 219 (citing

*Johnson*, 569 F.3d at 44). "Matters judicially noticed . . . are not considered matters outside the

pleadings." *Id.* (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 426 (2d Cir.

2008)).

In analyzing a motion to dismiss under Rule 12(b)(6), a court looks to whether a plaintiff

has plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A court must proceed "on the assumption that all the

allegations in the complaint are true." *Id.* at 555. Taken as true, these facts must establish "more

than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662,

677 (2007). "However, this does not mean that a claim must contain 'detailed factual

allegations' to survive a Rule 12(b)(6) motion to dismiss." *Eastman Chem. Co. v. Nestle Waters*

*Mgmt. & Tech.*, 2012 WL 4474587, at *4 (S.D.N.Y. Sept. 28, 2012) (citing *Talley v. Brentwood*

---

[1]    Federal Rule of Bankruptcy Procedure 7012(b) incorporates Federal Rule of Civil Procedure 12(c) into
adversary proceedings in bankruptcy.

*Union Free Sch. Dist.,* 2009 WL 1797627, at *4 (E.D.N.Y. June 24, 2009)).  Rather, the court

must determine "whether the 'well‑pleaded factual allegations,' assumed to be true, 'plausibly

give rise to an entitlement to relief.'"  *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010)

(quoting *Iqbal,* 556 U.S. at 679).  The court must draw all reasonable inferences in favor of the

non-moving party.  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000).  "[A]

complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising

an affirmative defense 'if the defense appears on the face of the complaint.'"  *Official Comm. of

Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, LLP, 322 F.3d 147, 158 (2d Cir.

2003) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir.1998)).

  In addition to considering the allegations in the Complaint, Gifford requests that the

Court take judicial notice of additional facts.  In deciding a motion to dismiss, a court may take

judicial notice of facts outside the complaint in appropriate circumstances.  *See Hirsch v. Arthur

Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (citing *Brass v. Am. Film Techs., Inc.*, 987

F.2d 142, 150 (2d Cir. 1993)) (considering facts alleged in the complaint, documents attached as

exhibits, and matters of which the judge may take judicial notice); *see also Cortec Indus., Inc. v.

Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (considering documents and statements

incorporated by reference).  Federal Rule of Evidence 201 permits the court to take judicial

notice of a fact that is not subject to reasonable dispute.  Fed. R. Evid. 201(b), (c).[2]  Judicial

notice is appropriate where a fact "(1) is generally known within the trial court's territorial

jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

be reasonably questioned."  Fed. R. Evid. 201(b).  Certified state court documents fall within the

---

[2]  "The Federal Rules of Evidence apply to bankruptcy proceedings by virtue of Federal Rule of Evidence
1101." *Universal Church v. Geltzer*, 463 F.3d 218, 226 n.4 (2d Cir. 2006); Fed. R. Bankr. P. 9017.

ambit of Rule 201(b)(2), which includes indictments, certificates of disposition, and minute

entries. *See Smith v. City of New York*, 2013 WL 6158485, at *1 (S.D.N.Y, Nov. 25, 2013)

(citing *Awelewa v. New York City,* 2012 WL 601119, at *2 (S.D.N.Y. Feb. 22, 2012) (allowing

judicial notice of arrest reports, criminal complaints, indictments, and criminal disposition data)).

The Complaint discusses criminal proceedings relating to Debtor Lehr and its employees,

including a criminal investigation, Compl. ¶ 48, search warrant (and the execution thereof),

Compl. ¶¶ 49-50, indictment of Lehr by the grand jury, Compl. ¶ 56, and cooperation agreements

entered into by Gifford and other parties. Compl. ¶ 61. But the Complaint does not address

events in these criminal proceedings after Lehr's indictment. Defendant Gifford requests,

therefore, that the Court take judicial notice of such later proceedings, including Lehr's

conviction for operation of a corrupt corporate enterprise. Gifford's Mem. of Law, at 3-5. This

means taking judicial notice of various documents from the New York State Supreme Court's

Criminal Term in New York County regarding the criminal case against Lehr and its employees.

*See* Decl. of Joseph Aronauer, ¶ 2 [ECF No. 15-1].[3] As such documents satisfy the requirements

for judicial notice and are not objected to by the Trustee, the Court will take judicial notice of

these criminal proceedings.

## II.    The Faithless Servant and *In Pari Delicto* Doctrines

The faithless servant doctrine applies where an individual "owes a duty of fidelity to a

principal and . . . is faithless in the performance of . . . services." *Phansalkar v. Andersen

Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (quoting *Feiger v. Iral Jewelry, Ltd.*, 41

---

[3]       Gifford requests that the Court take judicial notice of the following documents: Criminal Indictment of
Lehr, Jeffrey Lazar and Steven Wasserman [ECF No. 15-5]; Certificate of Disposition against Lehr [ECF No. 15-6];
Certificate of Disposition against Jeffrey Lazar [ECF No. 15-7]; Certificate of Disposition against Steven
Wasserman [ECF No. 15-8]; and Minute Book Entries of Criminal Case against Lehr, Jeffrey Lazar and Steven
Wasserman [ECF No. 15-9].

N.Y.2d 928, 928 (1977)).  The doctrine allows the principal to recover any commission or salary that it paid to the faithless servant.  *See Phansalkar*, 344 F.3d at 200 (quoting *Wechsler v. Bowman*, 285 N.Y. 284, 292 (1941)).  "In addition, the agent must disgorge any profits made as a result of his breach."  *Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, *9 (S.D.N.Y. Mar. 19, 2009) (citing *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 416 (2001)).

New York courts apply two alternative standards for determining whether an employee's conduct is covered by the faithless servant doctrine.  *See Phansalkar*, 344 F.3d at 201-02.  The *Turner* standard requires that the "misconduct and unfaithfulness . . . substantially violate [] the contract of service."  *Id.* at 201 (quoting *Turner v. Konwenhoven*, 100 N.Y. 115, 120 (1885)).  The Second Circuit has articulated that, under the *Turner* standard, courts "have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior."  *Phansalkar*, 344 F.3d at 201-02 & n.13 (citing *Schwartz v. Leonard*, 526 N.Y.S.2d 506, 508 (N.Y. App. Div. 2d Dep't 1988); *Bravin v. Fashion Week, Inc.*, 342 N.Y.S.2d 971, 974 (N.Y. Civ. Ct. N.Y. Cnty. 1973)).  The *Murray* standard requires only that an agent "act[] adversely to his employer in any part of [a] transaction, or omit[] to disclose any interest which would naturally influence his conduct in dealing with the subject of [his] employment."  *Phansalkar*, 344 F.3d at 202 (quoting *Murray v. Beard*, 102 N.Y. 505, 508 (1886)).  Regarding the *Murray* standard, the Second Circuit has explained that "misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture."  *Phansalkar*, 344 F.3d at 202 (citing *Lamdin v. Broadway Surface Adver. Corp.*, 272 N.Y. 133, 138 (1936)).

In defending a faithless servant claim, an employee may invoke the doctrine of *in pari delicto*, which provides that the courts will not intercede to resolve a dispute between two

wrongdoers.  *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (describing the *in pari delicto* doctrine); *Teneyck, Inc. v. Rosenberg*, 957 N.Y.S.2d 845 (N.Y. Sup. Ct.), *aff'd*, 975 N.Y.S.2d 335 (N.Y. App. Div. 1st Dep't 2013) (applying the *in pari delicto* doctrine to faithless servant claim).  In its full form, *in pari delicto potior est condition defendentis* means "in a case of equal or mutual fault . . . the position of the [defending party] . . . is the better one."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations in original) (quoting Black's Law Dictionary 711 (5th ed.1979)).  The *in pari delicto* doctrine is "rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct."  *Pinter v. Dahl*, 486 U.S. 622, 632 (1988).  As the New York Court of Appeals has explained:

> This principle has been wrought in the inmost texture of our common law for at least two centuries.  The doctrine . . . avoids entangling courts in disputes between wrongdoers. . . . Indeed, the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be weakened by exceptions.

*Kirschner*, 15 N.Y.3d at 464 (citations omitted).

The paramount inquiry under *in pari delicto* is the relative fault among the parties to the lawsuit.  *Deangelis v. Corzine (In re MF Global Holdings Ltd. Inv. Litig.)*, 998 F. Supp. 2d 157, 190-91 (S.D.N.Y.) ("*Kirschner* focuses . . . on the relative fault of the plaintiff and the defendant."), *aff'd on reconsid.*, 2014 U.S. Dist. LEXIS 32028, at *24 (S.D.N.Y. Mar. 11, 2014).  In general, the defense of *in pari delicto* shields a defendant from a plaintiff's claim if the plaintiff was (1) "an active, voluntary participant in the unlawful activity that is the subject of the suit," and (2) either the degrees of fault between the plaintiff and defendant are "essentially indistinguishable," or the "plaintiff's responsibility [is] clearly greater."  *Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir. 2014); *Pinter*, 486 U.S. at 635-36 ("Unless the degrees of fault

are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed . . . ."). State law determines whether the *in pari delicto* defense applies. *See Goldin v. Primavera Familienstiftung, Tag Assocs., Ltd.(In re Granite Partners, L.P.)*, 194 B.R. 318, 328 (Bankr. S.D.N.Y. 1996) (citing *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84-85 (1994)).

In assessing the *in pari delicto* doctrine, a bankruptcy "trustee stands in the shoes of [the] bankrupt corporation." *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d at 189 ("Because a trustee stands in the shoes of a bankrupt corporation, *in pari delicto* prevents the trustee from recovering in tort if the corporation, acting through authorized employees in their official capacities, participated in the tort.") (citations omitted); *see Picard v. JP Morgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.)*, 721 F.3d 54, 59, 64 n.13 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2895 (2014) (for purposes of *in pari delicto*, the trustee stands in the shoes of Bernard L. Madoff Investment Securities LLC, a brokerage firm used as a vast Ponzi scheme) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000)). When a bankruptcy trustee brings a claim against an agent of that corporation, the trustee bears the burden of the acts and knowledge imputed to the corporation for *in pari delicto* purposes. *See Teras Int'l Corp. v. Gimbel*, 2014 WL 7177972, at * 9 (S.D.N.Y. Dec. 17, 2014) ("The fact that the challenged conduct was committed by [the bankrupt corporation's] agents, rather than [the bankrupt corporation] itself, is irrelevant . . . ."). "A corporation is represented by its officers and agents, and their fraud in the course of the corporate dealings is in the law the fraud of the corporation." *Id.* (citing *Kirschner*, 15 N.Y.3d at 465). "The acts of agents and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals . . . even where the agent acts less than admirably, exhibits poor business judgment, or commits

14

fraud." *Teras Int'l*, 2014 WL 7177972, at *9 (quoting *Kirschner*, 15 N.Y.3d at 465); *see also*

*Kirschner*, 15 N.Y.3d at 466 ("[W]here conduct falls within the scope of the agents' authority,

everything they know or do is imputed to their principals.").

There are some circumstances, however, where imputation of a defendant's conduct to

the corporation is not appropriate for purposes of *in pari delicto*.  For example, corporate insiders

cannot rely upon the *in pari delicto* defense.  *See Hosking v. TPG Capital Mgmt., L.P. (In re*

*Hellas Telecomms. (Luxembourg) II SCA)*, 524 B.R. 488, 532 (Bankr. S.D.N.Y. 2015) ("The *in*

*pari delicto* doctrine does not apply to the actions of fiduciaries who are insiders in the sense that

they either are on the board or in management . . . .") (citation and internal quotation omitted).

The reasoning is that "it would be absurd to allow a wrongdoing insider to rely on the imputation

of his own conduct to the corporation as a defense." *In re Refco Inc. Sec. Litig.*, 2010 WL

6549830, at *15 (S.D.N.Y. Dec. 6, 2010), *aff'd in part*, 779 F. Supp. 2d 372 (S.D.N.Y. 2011);

*see In re Bernard L. Madoff Inv. Secs. LLC*, 458 B.R. 87, 123-24 & n.26 (S.D.N.Y. 2011)

(explaining the same and collecting cases).  "General partners, sole shareholders, and sole

decision makers are paradigmatic insiders for purposes of the *in pari delicto* doctrine under New

York law." *Hellas*, 2015 WL 373647, at *30.  In addition to such classic insiders, the *in pari*

*delicto* doctrine also does not apply to the actions of those who controlled the corporation in

some way.  *In re Refco Inc. Sec. Litig.*, 2010 WL 6549830, at *16 ("[C]ase law . . . provides that

*in pari delicto* does not apply to the actions of fiduciaries who are insiders in the sense that they

either are on the board or in management, or in some other way control the corporation.")

(collecting cases); *see also Hellas*, 2015 WL 373647, at *29 ("The *in pari delicto* doctrine does

not apply to the actions of fiduciaries who are insiders . . . that . . . in some other way [aside from

being on the board or in management] control the corporation.").  To determine whether the

15

insider exception applies, federal courts consider "whether the particular defendant served in a

board or management position, or otherwise exercised *de facto* control over [the principal],

not . . . whether the defendant [agent] more broadly had a fiduciary relationship with the

[principal]." *In re Refco Inc. Sec. Litig.*, 2010 WL 6549830, at *15.[4]

Another instance where imputation is not appropriate is the adverse interest exception,

which applies where the bad acts of the agent were committed for the agent's personal benefit.

*In re Bernard L. Madoff Inv. Secs. LLC.*, 721 F.3d at 64 (citing *The Mediators, Inc. v. Manney*

*(In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997)).  The adverse interest exception is

extremely narrow and should only be applied in "cases of outright theft or looting or

embezzlement, where the fraud is committed against a corporation rather than on its behalf." *Id.*

(citing *Kirschner*, 15 N.Y.3d at 467).  For this narrow exception to apply, "the scheme that

benefitted the insider [must have] operated at the corporation's expense." *Mashreqbank PSC v.*

*Ahmad Hamad Algosaibi & Bros. Co.*, 2013 WL 3782228, at *5 (N.Y. Sup. Ct. N.Y. Cnty., July

18, 2013).  Indeed, "[s]o long as the [defendant's] fraudulent conduct enables the business to

survive . . . the adversity test is not met." *Id.* (quoting *Kirschner*, 15 N.Y.3d at 468).  Thus,

where a plaintiff has admitted to "committing the same acts as defendant," the adverse interest

exception cannot operate.  *See Teneyck, Inc.*, 957 N.Y.S.2d at 848-49; *see also Mosionzhnik*, 972

N.Y.S.2d at 848 (employer could not recover from a former employee on allegations of fraud

where the employer benefitted from the bad acts).

---

[4]       Two recent New York state court decisions allowed defendants, who were clearly insiders under the federal
case law, to use the *in pari delicto* defense.  In *Mosionzhnik v. Chowaiki*, 972 N.Y.S.2d 841 (N.Y. Sup. Ct. N.Y.
Cnty. 2013), the court held that *in pari delicto* barred an art gallery company's fraud claim against a director, Vice-
President, and Secretary of that company.  *Id.* at 847-48.  In *Teneyck, Inc. v. Rosenberg*, 957 N.Y.S.2d 845, 849
(N.Y. Sup. Ct. N.Y. Cnty. 2013), *aff'd*, N.Y.S.2d 335 (N.Y. App. Div. 1st Dep't 2013), the court held that *in pari
delicto* barred a plaintiff corporation's claims for faithless servant and breach of employee fiduciary duty against its
president defendant.  Neither decision in *Teneyck* nor *Mosionzhnik* addressed the insider exception to the *in pari
delicto* doctrine, however, so it is unclear whether that issue was raised before the court.

But the adverse interest exception itself has an exception. It does not apply where the principal and agent can be considered identical. This so-called sole actor rule "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing [conduct that defrauds the corporation] because the party that should have been informed was the agent itself albeit in its capacity as principal." *In re Mediators, Inc.*, 105 F.3d at 827 (citing *Munroe v. Harriman*, 85 F.2d 493, 495-97 (2d Cir. 1936)). In reality, there is no one to whom the agent's wrongdoing may impute. *See O'Connell v. Penson Fin. Servs. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 47 (Bankr. S.D.N.Y. 2013) (citing *In re Mediators, Inc.*, 105 F.3d at 827). For example, the sole actor rule lifts the adverse interest exception's bar to imputation when "the principal is a corporation and the agent is its sole shareholder." *In re Mediators, Inc.*, 105 F.3d at 827. If the sole shareholder's conduct defrauded the corporation consistent with the adverse interest exception, "it would be nonsensical to refrain from imputing the agent's acts of fraud to the corporation . . . because the agent is identical to the corporation." *Ernst & Young v. Bankruptcy Servs. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 373 (S.D.N.Y.), *reh'g granted*, 318 B.R. 761 (S.D.N.Y. 2004), *aff'd in relevant part*, 529 F.3d 432, 447 n.5 (2d Cir. 2008) (citing *In re Mediators, Inc.*, 105 F.3d at 827). "The same analysis would apply to a corporation owned and managed by multiple people, so long as all of them were involved together in a fraud against the corporation." *Id.*

The corollary to the sole actor rule is the innocent insider exception, which turns upon whether other innocent persons "inside the corporation had the power to stop the fraud." *In re Arbco Capital Mgmt., LLP*, 498 B.R. at 48 (citing *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 202 (Bankr. S.D.N.Y. 2009)). But courts do not consider the innocent insider exception to be an independent basis to avoid imputation:

17

> Unless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exist; the agent is still acting on behalf of the company and his actions will be imputed to the company notwithstanding the existence of those innocent insiders.

*In re CBI Holding Co., Inc.*, 311 B.R. at 373; *cf. In re 1031 Tax Group, LLC*, 420 B.R. at 205-206 (rejecting trustee's complaint that "marshal[led] limited and conclusory allegations regarding the power of insiders to halt [the principal's] fraud . . . [which was] essentially a restatement of the standard required for the application of the innocent insider exception.") (citations omitted).[5]

## III.    The *In Pari Delicto* Doctrine Bars the Trustee's Faithless Servant Claim

Applying all these principles to the current dispute, the Court concludes that the *in pari delicto* doctrine bars the Trustee's faithless servant claim.

As a threshold matter, the bankrupt corporation was at least equal in fault to Defendant Gifford for the criminal scheme.  Indeed, it appears that Gifford was merely a participant in a scheme that was overseen by a senior officer at Lehr, Jeffrey Lazar, and included Gifford's boss

---

[5]    The Defendant cites *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), for the proposition that the "Trustee stands in the shoes of the Debtor."  Gifford's Mem. of Law, at 5 (citing *Wagoner*, 944 F.2d at 118.).  But the Defendant does not raise the "Wagoner Rule," a "prudential standing rule" announced in that case providing "that when a bankruptcy corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against *the third party* for the damage to the creditors."  *Hellas*, 2015 WL 373647, at *28 (citations and internal quotations omitted) (emphasis added).

Despite many similarities, the *in pari delicto* doctrine and the Wagoner Rule are distinct.  *See In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005) (explaining that *in pari delicto* and the Wagoner Rule are not the same).  Some courts have analyzed the Wagoner Rule and *in pari delcito* together because both are "grounded in substantive agency law" and "identical tests appear to apply to both doctrines."  *Hellas*, 2015 WL 373647, at *29.  But "[t]he Wagoner Rule is one of standing.  *In pari delicto* is an equitable defense analogous to unclean hands rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct."  *Grumman Olson Indus.*, 329 B.R at 424 n.5.  "[T]he fact pattern in which Wagoner is generally invoked [is] where an outsider, such as an accounting or law firm, is alleged to have assisted management in defrauding the corporation."  *Global Crossing Estate Rep. v. Winnick*, 2006 WL 2212776, at *15 n.20 (S.D.N.Y. Aug. 3, 2006) (quoting *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 23 (Bankr. E.D.N.Y. 2006)); *see also Global Crossing*, 2006 WL 2212776, at *15 n.20 (collecting cases, including those that raise the Wagoner Rule where a plaintiff seeks to sue a "third party," "outside entity," and "outside professional.").  In any event, the Court does not analyze the applicability of the Wagoner Rule here as it is not invoked by the Defendant.

Martino (the head of the purchasing department), Mitchell (the head of the cost control department) and Wasserman (the head of the estimating department). Compl. ¶¶ 35-36, 38, 42, 44-46. By imputing the acts of Jeffrey Lazar and other management to Lehr, Lehr was an active participant in the criminal scheme in a way at least as culpable as the Defendant. *See In re 1031 Tax Grp., LLC*, 420 B.R. at 203; *Republic of Iraq*, 768 F.3d at 162. The equal or greater culpability of Lehr for the criminal scheme is confirmed by the result of the criminal trial— concerning the same criminal scheme—where Lehr was convicted of enterprise corruption, a scheme to defraud, grand larceny in the second degree, and money laundering in the first degree. Certificate of Disposition of Criminal Case against Lehr; *see* Hr'g Tr. 30:1-13. Even reading the Complaint in a light most favorable to the Trustee, therefore, the degrees of fault between Lehr and Gifford are at best "essentially indistinguishable," thus satisfying the relative fault requirement of the *in pari delicto* doctrine. *See Republic of Iraq*, 768 F.3d at 162.

The Trustee argues that *in pari delicto* does not apply for a variety of reasons, but none are persuasive. The Trustee first relies on the adverse interest exception to *in pari delicto*. The Trustee accurately states that "[t]o come within the exception, the agent [here, the Defendant] must have totally abandoned his principal's interest and be acting entirely for his own or another's purposes." Trustee's Mem. of Law, at 25. The Trustee overlooks, however, that the exception's applicability turns on the "crucial distinction . . . between conduct that defrauds the corporation and conduct that defrauds others for the corporation's benefit." *Kirschner*, 15 N.Y.3d at 467. Thus, the adverse interest exception is applicable only in "cases [of] outright theft or looting or embezzlement [] . . . where the fraud is committed *against* a corporation rather than on its behalf." *Kirschner*, 15 N.Y.3d at 466-67.

This is not the circumstance here.  The Complaint is completely devoid of any allegation that Gifford looted, embezzled, or committed fraud for his own personal benefit rather than on Lehr's behalf.  The Trustee does not allege that Gifford pocketed any money from the criminal scheme or even that he received additional compensation for his participation.  Rather, the Complaint states that the fraud was for the benefit of Lehr.  For example, the Complaint provides that "Lehr should have returned to the customer—but did not— . . . excess payments for unperformed work."  Compl. ¶ 39; *see id.* ¶ 35 (Lehr and its subcontractors conspired to keep the customers' funds); *id*. ¶ 45.  Moreover, the Trustee admitted that the criminal scheme that Lehr was convicted of and the criminal scheme that is the subject of Complaint against the Defendant are the same.  *See* Hr'g Tr. 30:1-13; *Teneyck*, 957 N.Y.S.2d at 849 (adverse interest exception not met where plaintiff admits to committing the same acts as defendant); s*ee Kirschner*, 15 N.Y.3d at 468 (quoting *Baena v. KMPG LLP*, 453 F.3d 1, 7 (1st Cir. 2006)) (adverse interest test is not met where company profits from fraud in the first instance, even if fraud is not in the long-term interest of the company).

The Trustee asserts that some faithless servant cases allow principals to recover commissions paid to unfaithful servants, even where the servant's services proved beneficial to the principal.  The Trustee asserts that the policy goal in such instances is to enable principals to police their agents when third parties are not impacted.  To meet this policy goal, the Trustee concludes, the New York Court of Appeals would expand the "adverse interest exception to *in pari delicto*" to cover this case and enable principals to recover from faithless servants, even where the servant's services benefitted the principal.  *See generally Charles A. Sullivan, Mastering the Faithless Servant?:  Reconciling Employment Law, Contract Law, and Fiduciary Duty*, 2011 Wis. L. Rev. 777 (2011).  But the Trustee cites no case law suggesting that New

York has or would apply the doctrine this way.  In fact, a recent New York appellate court

decision suggests otherwise.  In *Teneyck, Inc.*, the First Department held that the adverse interest

exception did not apply in a faithless servant action where the complaint demonstrated that the

plaintiff profited from or committed the same acts as the defendant.  *Teneyck, Inc.*, 975 N.Y.S.2d

335; *cf. Kirschner*, 15 N.Y.3d at 464 ("principle that a wrongdoer should not profit from his own

misconduct is so strong in New York that we have said the defense applies even in difficult cases

and should not be weakened by exceptions.").  Just as in *Teneyck*, the Complaint here alleges

that Jeffrey Lazar—and Lehr by imputation— committed the same acts as Gifford, Compl. ¶¶

38, 42, and that the criminal scheme provided Lehr with benefits including "excess payments for

unperformed work." Compl. ¶ 39.

The Trustee also mistakenly relies upon the innocent insider exception.  More

specifically, the Trustee contends that Lehr's 90% controlling shareholder, Gerald Lazar, was an

innocent insider and would have "objected" to the criminal scheme if he had known about it.

The Trustee asserts that Gerald was Lehr's "*de facto* chief executive officer" and "very

conscious of avoiding further problems with law enforcement" because of a misdemeanor

conviction in 1998.  Given his power and concerns arising from his prior misdemeanor

conviction, the Trustee argues, Gerald "would have and could have stopped" Lehr's fraud if he

had known about it.  But there is no mention of Gerald Lazar in the Complaint.  Thus, the

Trustee has failed to plausibly allege that Gerald would have or could stopped Lehr's scheme so

as to satisfy the innocent insider inquiry.  *See In re 1031 Tax Grp., LLC*, 420 B.R. at 206 (citing

*Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 994 F. Supp. 202, 208-14 (S.D.N.Y.

1998)).  In any event, the innocent insider exception is not a stand-alone exception to the general

rules of imputation.  *See In re Arbco Capital Mgmt., LLP*, 498 B.R. at 48.  It does not matter

whether Gerald knew of the scheme, would have tried to stop the scheme, or could have stopped

the scheme, "unless the adverse interest exception to the presumption of imputation applies." *In

re 1031 Tax Grp., LLC*, 420 B.R. at 203 (quoting *In re CBI Holding Co., Inc.*, 311 B.R. at 373).

As the adverse interest exception does not apply here for the reasons stated above, the innocent

insider exception cannot apply. *See id.*

The Trustee additionally argues that Gifford cannot benefit from *in pari delicto* because

he is a Lehr insider, relying upon *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737 (Bankr.

S.D. Tex. 2008). But the Trustee's reliance on *Today's Destiny* is misplaced. In *Today's*

*Destiny*, the court applied the insider exception to four defendants who raised the *in pari delicto*

defense in a joint motion to dismiss claims against them. Three of the defendants were on the

board or in management positions—seemingly model insiders—but the fourth was merely a

"'closer' in the [corporation's] sales department." *Today's Destiny*, 388 B.R. at 742 n.1. But the

*Today's Destiny* decision does not discuss the role of the closer in the sales department and why

such an individual would qualify as an insider. Moreover, there do not appear to be any claims

against this fourth individual at issue in the *in pari delicto* ruling.[6] Given these facts, any

---

[6]        In *Today's Destiny*, the court identified the "closer" Jared Day as one of the "Insiders" who raised the *in pari delicto* defense. 388 B.R at 749 ("Insiders Max K Day, Mike Day, Max O Day, and Jared Day, contend that *in pari delicto* denies the Trustee standing to assert claims against them."). But in setting the stage for its ruling on *in pari delicto*, the court made clear that there were actually no claims against Jared Day. As the court stated:

> [O]nly the following claims survive in the Trustee's Second Amended Complaint as to the Insiders:
>
> • Breach of Fiduciary Duties against Michael Day, Max K. Day, Max O. Day, Chaz Robertson, Joshua Smith, and Terry Vanderpool.
>
> • Defendants' Liability as Alter Egos or for Sham to Perpetuate a Fraud against Michael Day, Max K. Day, Max O. Day, Medicus Marketing, IDB, and Joshua Smith.
>
> • Denuding the Corporation and Conspiracy to Denude the Corporation against Michael Day, Max K. Day, and Max O. Day.

*Id*. at 745. It is, therefore, not surprising that the decision contains no separate discussion of Jared Day.

discussion on this fourth individual appears to be *dicta* at best. *Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930, 934-35 (2d Cir. 1980) ("[T]he safer course is to read judicial opinions as deciding only what they purport to decide."); *see also United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975) (describing *obiter dicta*).  In any event, the Complaint here does not allege any facts to plausibly suggest that Defendant Gifford is a "principal" or "insider" of Lehr.  There are no allegations that Gifford served in a board or management position, or otherwise exercised control over Lehr.  *See In re Refco Inc. Sec. Litig.*, 2010 WL 6549830, at *16; s*ee also Hellas*, 2015 WL 373647, at *30.  Rather, the Complaint alleges only that Gifford was an employee who was supervised by the head of the purchasing department, Compl. ¶¶ 37-38, who in turn reported to Jeffrey Lazar.  Compl. ¶ 45.  Finally, *Today's Destiny* was decided under Texas state law.  388 B.R. at 748.  Although the parties dispute what body of law informs the definition of the term "insider" for this exception, neither party asserts, nor could they, that Texas state law governs.  The Trustee does not provide any authority under New York law interpreting the term "insider" in a way that would capture the Defendant based on the facts alleged in the Complaint.[7]

---

[7]    Various commentators have suggested that the *in pari delicto* doctrine is poorly suited to situations where a bankruptcy trustee is seeking to recover money against employees to pay creditors.  *See* 2012-2014 Final Report and Recommendations of the American Bankruptcy Institute Commission to Study the Reform of Chapter 11 at 187 & n.714, 190 & nn.717-18 (Dec. 8, 2014), *available at* commission.abi.org (citations omitted).  But absent changes to the Bankruptcy Code, the doctrine remains applicable here by virtue of New York law's clear dictates on the matter.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Court finds that the faithless servant claim is barred by *in pari delicto*.  As such, the Court grants the Defendant's motion to dismiss.  The Defendant shall submit an order on three days' notice.

Dated:  New York, New York
        April 3, 2015


                                    */s/ Sean H. Lane*_____
                                    UNITED STATES BANKRUPTCY JUDGE